**GIRARD SHARP LLP**
Dena C. Sharp (State Bar No. 245869)
dsharp@girardsharp.com
Simon S. Grille (State Bar No. 294914)
sgrille@girardsharp.com
Nina R. Gliozzo (State Bar No. 333569)
ngliozzo@girardsharp.com
Jordan Isern (State Bar No. 343159)
jisern@girardsharp.com
601 California Street, Suite 1400
San Francisco, CA 94108
Telephone: (415) 981-4800
Facsimile: (415) 981-4846

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TYRONE HAZEL, ROXANE EVANS, VALERIE TORRES, and RHONDA HYMAN, individually and on behalf of all others similarly situated, | Case No. 3:22-cv-07465-CRB |
| Plaintiffs, | **SECOND AMENDED CLASS ACTION COMPLAINT** |
| vs. | **DEMAND FOR JURY TRIAL** |
| PRUDENTIAL FINANCIAL, INC., ACTIVEPROSPECT, INC., and ASSURANCE IQ, LLC | |
| Defendants. | |

**NATURE OF THE ACTION**

1.     Prudential Financial Inc., acting on its own behalf and through its wholly owned subsidiary, Assurance IQ, LLC (collectively, "Prudential"), offers consumers a quote for life insurance in minutes if they fill out a form online at Prudential.com. To obtain the quote, consumers must enter private information about themselves and their health history.

2.     ActiveProspect Inc. ("ActiveProspect") sells software that records consumer interactions with a website in real time. Website owners can use this software by adding ActiveProspect's javascript[1] into the source code of their webpage. Doing so permits both ActiveProspect and the website owner to record a visitor's keystrokes and other actions on the website.

3.     Prudential embedded ActiveProspect's software in the computer code on its website to optimize its lead generation efforts. Prudential benefits financially from collecting information provided by potential customers, or "leads," who indicate an interest in purchasing life insurance or other financial products. Adding ActiveProspect's software allowed both companies to surreptitiously observe and record visitors' keystrokes, mouse clicks, and other electronic communications, including their entry of Personally Identifiable Information ("PII") and Protected Health Information ("PHI").

4.     When users seeking a life insurance quote enter private information on Prudential.com, Prudential shares those communications with ActiveProspect in real time, without notifying users and without first obtaining their consent. The communications Prudential shares with ActiveProspect include users' geolocation and answers regarding their private, personal and medical information, such as age, height, weight, information regarding medical conditions, prescribed medications, and hospitalization history. ActiveProspect's software purports to increase the value of Prudential's leads by harvesting extra information about each person and independently documenting the information the person provided.

5.     By intercepting website users' communications, Prudential and ActiveProspect violate the California Invasion of Privacy Act ("CIPA"), Cal. Penal Code § 631, and invade Plaintiffs' and class members' privacy rights in violation of the California Constitution.

---

[1] JavaScript is a programming language commonly used in website development to add features and functions to a website.

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:22-cv-07465-CRB

6.      Plaintiffs Valerie Torres and Rhonda Hyman each used the Prudential website to search for an insurance quote, entering private information into the online form at Prudential.com. During each visit, Defendants Prudential and ActiveProspect recorded Plaintiffs' electronic communications in real time, and used the intercepted data to learn their identity, zip code, date of birth, height, weight, medical and psychiatric conditions and treatment history, use of prescription medications and tobacco products, or other PII and PHI without their consent.

7.      Plaintiffs bring this action on behalf of themselves and a class of all other Californians whose electronic communications were intercepted through Prudential's use of ActiveProspect software on its website.

**JURISDICTION AND VENUE**

8.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A) because this case is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000.00, exclusive of interest and costs, and at least one member of the proposed class is citizen of state different from at least one Defendant.

9.      This Court has personal jurisdiction over Defendants because each of the Defendants purposefully availed itself of the laws and benefits of doing business in California, and Plaintiffs' claims arise out of each of the Defendants' forum-related activities. A substantial portion of the events giving rise to Plaintiffs' claims occurred in this District.

10.      Pursuant to 28 U.S.C. § 1391, this Court is a proper venue for this action because a substantial part of the events, omissions, and acts giving rise to the claims herein occurred in this District.

**DIVISIONAL ASSIGNMENT**

11.      Assignment to the San Francisco or Oakland Division is appropriate under Local Rule 3-2(c) and (d) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in Alameda County.

**PARTIES**

12.      Plaintiff Valerie Torres is a citizen of the State of California and resides in Los Angeles, California.

13.     Plaintiff Rhonda Hyman is a citizen of the State of California and resides in Los Angeles, California.

14.     Defendant Prudential Financial Inc. is a New Jersey company with its principal place of business at 751 Broad Street, Newark, NJ 07102.

15.     Prudential Financial, Inc. is a global financial services provider and active global investment manager. Among other services, Prudential Financial, Inc. "matches buyers with products such as life and health insurance and auto insurance, enabling them to make purchases online or through an agent."[2]

16.     Prudential Financial, Inc. does business throughout California and the entire United States.

17.     Prudential Financial, Inc. owns and operates Prudential.com.

18.     Defendant Assurance IQ, LLC is a Washington limited liability company with its principal place of business at 920 5TH AVE., SUITE 3600 SEATTLE, WA 98104. Assurance IQ, LLC is a wholly-owned subsidiary of Prudential Financial, Inc.

19.     Assurance IQ, LLC does business throughout California and the entire United States.

20.     Prudential Financial, Inc. collaborated with Assurance IQ, LLC on the creation of term.prudential.com, the webform on Prudential.com that uses ActiveProspect's TrustedForm technology. Assurance IQ, LLC, on behalf of Prudential Financial, Inc., handles the day-to-day operation and maintenance of that webform.

21.     Allegations in this complaint regarding "Prudential" mean both Prudential Financial Inc. and Assurance IQ, LLC. At all relevant times, Prudential Financial, Inc. and Assurance IQ, LLC were each a principal, agent, alter ego, joint venturer, partner, or affiliate of one another, and in doing the acts alleged herein, were acting within the course and scope of that principal, agent, alter ego, joint venture, partnership, or affiliate relationship. Prudential Financial, Inc. and Assurance IQ, LLC had actual knowledge of the wrongful acts of the other Defendants; ratified, approved, joined in, acquiesced, or authorized the wrongful acts of the other Defendants.

---

[2] https://www.prudential.com/about.

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:22-cv-07465-CRB

22.    Defendant ActiveProspect Inc. is a Nevada corporation with its principal place of business at 4009 Marathon Boulevard, Austin, TX 78756.

23.    ActiveProspect is a software-as-a-service ("SaaS") company. In connection with its services to website operators, ActiveProspect provides a software product called "TrustedForm," which monitors and records a website user's activity on a webpage. TrustedForm purports to increase the value of leads generated on third party websites by capturing the information each lead provides and recording other information about them such as their IP address and geolocation.

### FACTUAL ALLEGATIONS

### I.    ActiveProspect Offers "TrustedForm" Lead Generation Software

24.    Defendant ActiveProspect provides a variety of "real time" products for companies that generate online leads for products or services or that engage in telemarketing.

25.    As a patent obtained by ActiveProspect explains, "'Lead generation' generally refers to the creation or generation of prospective consumer interest or inquiry into products or services of a business. . . . In a typical lead generation scenario, a consumer completes an online request form on a website."[3] In such a scenario, the owner of the website with the form is the lead seller, and a separate party who purchases the consumer's data is the lead buyer.

26.    One of ActiveProspect's products is called "TrustedForm," which it touts as a "lead certification product" that purports to help businesses authenticate user interactions with a website, including, for example, by recording a user's responses to questions. TrustedForm provides a "means for a lead buyer to verify when and where an Internet lead was collected by a lead seller."[4]

27.    On its website, ActiveProspect states that one of the "key features and benefits" of TrustedForm is the "VideoReplay" feature, which records, in real time, a website visitor's keystrokes, mouse clicks and other interactions with a website. The video provides a "moment-by-moment replay of

---

[3] System and Method for Electronic Lead Verification, U.S. Patent No. 20120290491 A1 ("ActiveProspect Patent").

[4] *Supra* n.3, ActiveProspect Patent.

exactly what happened on the page in the order it happened. . . . **Whatever the user does on the page is captured, including changes and corrections to the information entered in the form**."[5]

28.     ActiveProspect also advertises other data that TrustedForm can acquire, including the "time on page," "lead age," and geographic location of user[6]:



**Fig. 1**

29.     ActiveProspect instructs prospective partners to add the "javascript to their form and start capturing lead certificates."[7] As soon as the TrustedForm Script is added to a webpage, ActiveProspect will automatically start to capture the data submitted in the form.[8]

30.     The code allows ActiveProspect to record the keystrokes, mouse clicks, data entry, and other electronic communications of visitors to websites where the code is installed. It also allows ActiveProspect to track the "website of origin" (the website from which a user navigated to the website using TrustedForm, i.e., part of the visitor's internet browsing history), amount of time spent on the website, geographic location of the visitor, and other information. ActiveProspect, in turn, provides this data to its clients.

---

[5] https://community.activeprospect.com/questions/4180654 (emphasis added).

[6] https://activeprospect.com/trustedform/insights/.

[7] https://activeprospect.com/blog/video-ease-of-implementing-trustedform/;
https://www.youtube.com/watch?v=Y5F4EjmG4CM.

[8] https://developers.activeprospect.com/docs/trustedform/implementing-trustedform-s-script/.

31.     The recording of keystrokes, mouse clicks, data entry, and other electronic communications begins the moment a user accesses or interacts with a webpage using TrustedForm.[9]

32.     According to ActiveProspect's patent, this user data collection occurs in real time: "[T]he verification server collects information about the visitor and the lead generator during the communication session during which the lead generator receives contact information and other relevant information (i.e. lead data) submitted by the visitor."[10]

33.     The patent further states that ActiveProspect's software transmits the information captured to ActiveProspect's server: "At this point, [ActiveProspect's] server is 'aware' of the URL of the form and begins to monitor the web page for any changes . . . From there on, the verification server monitors the web page . . . [F]or each change detected, snapshots of the web page are captured including at least one of the HTML, image files, and a high-resolution, full-length image of the web page."

34.     In a 2017 study by Princeton University researchers concerning similar technology, the researchers noted that "the extent of data collected by these services far exceeds user expectations; text typed into forms is collected before the user submits the form, and precise mouse movements are saved, all without any visual indication to the user."[11]

35.     All videos of customer data are hosted on Active Prospect's servers, as opposed to the servers or computers of ActiveProspect's clients. Accessing the video of a website visitor's interactions requires a unique URL link provided by ActiveProspect, which directs visitors to a web server on trustedform.com, where the video can be viewed. The link corresponds to a unique ID and a "certificate" that ActiveProspect generates and issues.

36.     ActiveProspect also acknowledges on its website that "TrustedForm independently collects and stores information about who filled out a form, when, and where."

---

[9] https://community.activeprospect.com/posts/4078773-trustedform-s-session-replay.

[10] System and Method for Electronic Lead Verification, U.S. Patent No. 20120290491 A1.

[11] https://freedom-to-tinker.com/2017/11/15/no-boundaries-exfiltration-of-personal-data-by-session-replay-scripts/.

37.     Several provisions in ActiveProspect's standard form End User License Agreement ("EULA") with its website-operator clients confirm that ActiveProspect records and receives data from website visitors:

- The EULA provides that "when a site visitor visits the [client's website], the TrustedForm Script contacts the Trusted Form Server, which then collects information about that site visit."

- The EULA requires website owners to agree that ActiveProspect "cannot and does not guarantee that Your Content and Data will not be accessed by unauthorized persons." The term "Content and Data" is defined to include "information pertaining to Leads [i.e., website visitors] that may contain individual, personally identifiable information."

- The EULA expressly gives ActiveProspect the right to use aggregate data collected from website visitors for any activity it deems to have a legitimate business purpose, including tracking and reporting on industry trends.

- The model language for privacy policies contained in the EULA states that TrustedForm "collects" information and "independently document[s] users' consent to be contacted."

38.     ActiveProspect's business model involves entering into partnerships with various companies, to which it furnishes its software. One of ActiveProspect's partners is Prudential.

39.     ActiveProspect benefits financially when lead generators like Prudential purchase its services associated with TrustedForm. And lead generators like Prudential who use TrustedForm benefit financially from sharing users' data with ActiveProspect, including because "certifying" leads and harvesting extra data about the users increases the value of the leads, which lead generators sell to lead buyers. Thus, both ActiveProspect and Prudential benefit from Prudential's use of TrustedForm.

## II.     Prudential Uses ActiveProspect's TrustedForm Software

40.     Prudential provides life insurance, retirement, mutual fund, annuities, and investment management services.

41.     On February 23, 2021, Prudential launched a page on Prudential.com where, to obtain a quote on a Prudential life insurance plan, consumers fill out a form online at term.prudential.com.

42.     Prudential Financial leveraged the technology of its wholly-owned subsidiary Assurance IQ to expand its direct-to-consumer distribution channels through the life insurance webform. Prudential Financial collaborated with Assurance IQ on the creation and operation of the webform, with Assurance IQ building the webform and performing day-to-day operation and maintenance on behalf of Prudential Financial.

43.     The webform to obtain a life insurance quote was designed including ActiveProspect's TrustedForm technology, and TrustedForm has operated on the webform since its launch.

44.     On the homepage of Prudential.com, users are prompted to select the "get an instant quote" button, shown below, to "get a quote in minutes."



**Fig. 2**

45.     After selecting the "get an instant quote" button, users are required to answer multiple questions, including questions about their medical health. Users must communicate to Prudential the following facts, among others:

      a.   Name, zip code, and date of birth;

      b.   Height and weight;

      c.   The use of prescription medications and tobacco products;

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:22-cv-07465-CRB

d.  Whether they have medical conditions, such as cancer, chronic pain, diabetes, heart or circulatory disorders, or respiratory disorders;

e.  Whether they have mental or psychological conditions, such as anxiety, depression, or bipolar syndrome;

f.  Treatment history for identified medical and psychological conditions and other PHI.

46.  Prudential uses TrustedForm on Prudential.com and has done so since approximately February 23, 2021.

47.  TrustedForm's code is embedded into the source code of Prudential's website, as shown in the red box below:



**Fig. 3**

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:22-cv-07465-CRB

48.    An ordinary consumer would not know that their answers in the life insurance form are being recorded or shared with a third party.

49.    Without the consent of the user, Prudential enables ActiveProspect to monitor, intercept, and record a user's interactions with the site as it asks questions including the following:

　　　　a.   "What is your gender?"

　　　　b.   "Have you used Tobacco Products within the last 12 months?"

　　　　c.   "Are you currently married?"

　　　　d.   "Do you have children?"

　　　　e.   "What is your date of birth?"

　　　　f.   "Why are you looking for life insurance?"

　　　　g.   "What is your height?"

　　　　h.   "What is your weight?"

　　　　i.   "Are you currently taking any prescription medications?"

　　　　j.   "In the past 5 years have you been treated or prescribed medication for any of the following conditions: anxiety/depression/bipolar; cancer; chronic pain; diabetes; heart or circulatory disorder; respiratory disorder; other medical condition?"



**Fig. 4**

　　　　k.   "Have you been hospitalized or missed more than 1 week of work due to anxiety, depression, or bipolar disorder?"

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:22-cv-07465-CRB

l. "Are you currently employed?"

m. "Is your heart or circulatory disorder ONLY high blood pressure?"



**Fig. 5**

n. "Do you have an amount of coverage in mind?"

o. "What is your zip code?"

p. "What is your email?"

q. "Please enter your mobile number"

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:22-cv-07465-CRB

50.   After answering these questions, users can view a quote. On the final page of the webform before the user can view a quote, above a button that says "View My Results," users are told, in light grey font, that "By clicking the View My Results Button, I agree to the consents below the button," as shown below.



**Fig. 6**

51.   During the class period, the language underneath the View My Results button was as follows, or substantially similar: "By completing the form above and clicking on the 'View My Results' button, I agree that Pruco Life Insurance Company, Prudential Life Insurance Company of America and their affiliates, including a Prudential representative or an appointed independent agent, including Assurance IQ (collectively 'Prudential') can contact me for marketing purposes by phone call (including with an auto dialer and even if I've requested not to be contacted by Prudential or am on a do-not-

1   call/contact list) or text (message and data rates may apply) at the phone number and email address

2   listed above. I also understand that consent isn't necessary to make an investment or purchase. To get a

3   quote for SimplyTerm and/or a final expense policy without providing consent please call [telephone

4   number]. To receive a Term Essential quote without providing consent, please call [telephone number]."

5       52.     After clicking "View My Results" and viewing any quote that is offered, some users may

6   continue filling out the form to apply for life insurance, after being prompted to answer additional

7   questions under the heading "Eligibility."

8       53.     Only after the consumer has already answered multiple personal questions, including the

9   ones described above, *all of which have already been recorded in real time*, does Prudential ask

10  consumers to consent to its Terms, as shown below.



**Fig. 7**

54.     Users who are not offered a quote for life insurance, and users who receive a quote but

chose not to proceed to provide all of the additionally requested "Eligibility" information do not reach or

view the page shown in Figure 7.

13

55.    Only if they click through to Prudential's privacy notice (the second of four fine-print links) would a consumer learn that Prudential "may share your personal information, including information about your transactions and experiences, among Prudential companies and with other non-Prudential companies who perform services for us or on our behalf, for our everyday business purposes."[12]

56.    Only if they click through to "Important Notice About Your Application" (the fourth fine-print link) would a consumer learn that Prudential "may disclose information we have collected as follows: to affiliates or third parties that perform services for us, or on our behalf."[13]

57.    From the time of the webform's launch on February 23, 2021 to approximately March 9, 2023, the Privacy Policies linked in the webform took users only to Prudential Financial's privacy policies. On or around March 10, 2023, Prudential changed the webform to instead link users to Assurance IQ's privacy policies.

58.    By the time consumers are presented with the screen shown above in Figure 7, the interception has already occurred—their personal information has already been captured without their knowledge or consent. In other words, even if a user reaches the point in the process at which Prudential asks for consent, if the user does not agree, and leaves the website, their information has already been captured and intercepted in real time.

59.    Prudential's consent disclosures do not adequately notify consumers that their responses to that point have been intercepted.

60.    On December 14, 2022, less than one month after the filing of Plaintiffs' initial complaint, and well after they visited Prudential's website, Prudential altered its website to add a small and inconspicuous disclosure to the life insurance quote form purporting to obtain user consent to record their inputs.

---

[12] https://assets.assurance.com/files/life/prudential/forms/privacy_notice/Privacy_Notice_2022.pdf.
[13]
https://assets.assurance.com/files/life/prudential/forms/Important_Notice_About_Your_Application/Other_States/NXU-IMPN+ED+05-2018+00+ZZ.pdf.

61.     The changes to Prudential's website acknowledge and demonstrate that before December 14, 2022, the Defendants did intercept and record users' communications and personal information without their knowledge or prior consent.

62.     Prudential knows that TrustedForm captures the keystrokes, mouse clicks and other communications of visitors to its website. Prudential pays ActiveProspect to supply that information.

63.     Pursuant to an agreement with ActiveProspect, Prudential voluntarily embedded ActiveProspect's software code on Prudential.com.

64.     As currently deployed, TrustedForm, as used by Prudential, operates as a wiretap.

65.     Prudential and ActiveProspect, and each of them, intercepted, recorded and monetized valuable personal information without the consent of website users. Prudential recognizes the value and market for this information on its website: "We sell or share Personal Information for the purpose of advertising." Prudential generates "leads" containing the intercepted information and either profits from selling life insurance to leads directly, or shares leads with its partner companies and receives a commission if one of them sells life insurance to the lead. ActiveProspect's TrustedForm product is designed to facilitate and increase the value of those leads.

66.     An older study values users' web-browsing histories at $52 per year. The Organization for Economic Cooperation and Development likewise estimated the prices for various elements of personal data: $0.50 for an address, $2 for birthdate, $8 for a Social Security number, $3 for a driver's license number, and $35 for a military record.[14] More recent estimates suggests higher values for personal data: a personal email can be worth $89, a complete health care record $250, and a hacked Facebook account can sell for $65 on the dark web.[15] Similarly, a 2019 report found that data generated from an adult is worth roughly $35 per month.[16]

---

[14] Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value, OECD DIGITAL ECONOMY PAPERS, No. 220 (Apr. 2, 2013), https://www.oecdilibrary.org/docserver/5k486qtxldmq-en.pdf.

[15] https://www.invisibly.com/learn-blog/how-much-is-data-worth/ (last accessed Jan. 30, 2023).

[16] https://www.vox.com/recode/2019/6/24/18715421/internet-free-data-ads-cost (last accessed Jan. 30, 2023).

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:22-cv-07465-CRB

**III.    Defendants Wiretapped Plaintiffs' Electronic Communications**

67.    **Valerie Torres.** In approximately October 2022, Valerie Torres used the Prudential Financial website to search for an insurance quote.

68.    Torres was in Los Angeles, California when she visited the website.

69.    During her visit, Prudential and ActiveProspect recorded Torres's electronic communications in real time, used the intercepted data to attempt to learn her identity, zip code, date of birth, height, weight, use of prescription medications and tobacco products, and other PII and PHI.

70.    Torres was unaware at the time that her keystrokes, mouse clicks, and other electronic communications, including the information described above, were being intercepted in real time and would be disclosed to ActiveProspect. At no point did Torres consent to share that private information with ActiveProspect.

71.    **Rhonda Hyman.** In approximately December 2021 and possibly also sometime between March 2022 and January 2023, Rhonda Hyman used the Prudential Financial website to search for an insurance quote.

72.    Hyman was in Los Angeles, California when she visited the website.

73.    During her visit, Prudential and ActiveProspect recorded Hyman's electronic communications in real time, used the intercepted data to attempt to learn her identity, zip code, date of birth, height, weight, use of prescription medications and tobacco products, and other PII and PHI.

74.    Hyman was unaware at the time that her keystrokes, mouse clicks, and other electronic communications, including the information described above, were being intercepted in real time and would be disclosed to ActiveProspect. At no point did Hyman consent to share that private information with ActiveProspect.

75.    During each Plaintiff's visit, the TrustedForm VideoReplay feature recorded a video capturing Plaintiffs' keystrokes and mouse clicks on the website as Plaintiffs were entering them. TrustedForm also captured the date and time of each visit, the duration of the visit, Plaintiffs' IP address, their location at the time of the visit, browser type, and the operating system on their device.

76.    Users, including Plaintiffs, did not receive notice of Prudential's Privacy Policy or Assurance IQ's Privacy Policy when they clicked "Get an instant quote," which initiates the interception of their responses on the form.

77.    Users, including Plaintiffs, do not provide informed consent when, after providing some personal information that has already been intercepted, they are presented with a series of links to Prudential's Privacy Policy and other terms. Even if the consumer were to click through to the terms, the disclosures do not adequately inform consumers that their activity is being intercepted. Moreover, by the time consumers reach the point where they must click purportedly to assent to the terms, the interception has already occurred, and their personal information has already been captured without their knowledge or consent. In addition, links to Assurance IQ's Privacy Policy were not provided to consumers during the class period.

78.    Prudential did not inform visitors to its websites that their keystrokes, mouse clicks and other communications were being recorded and shared with ActiveProspect. The limited disclosures Prudential does provide are given *after* Active Prospect and Prudential have already intercepted and recorded users' keystrokes and PII.

79.    No Plaintiff or Class member consented to being wiretapped on a Prudential website or to the recording and sharing of their communications with ActiveProspect. Moreover, any purported consent was ineffective because (i) the wiretapping began from the moment Plaintiffs and Class members accessed the web page; and (ii) even the later-linked Privacy Policy did not disclose the wiretapping, ActiveProspect's interception and recording of their PII, or its sharing of this sensitive information.

80.    In addition, during the class period, at no time before or during a user's browsing of its websites did Prudential disclose that it will be recording users' activities in real time. Prudential's Privacy Policy does not disclose that it records a user's activities in real time. Even if Prudential had disclosed its wiretapping in its Privacy Policy, Prudential still acted without Plaintiffs' consent because Prudential does not ask its users' consent until after it has already begun wiretapping them.

81.    When ActiveProspect and its website-owner clients wish to disclose ActiveProspect's technology, they do so explicitly. Model language, included in ActiveProspect's standard form EULA, states as follows:

> We use ActiveProspect's TrustedForm Script to independently document users' consent to be contacted. The TrustedForm Script is embedded on our website and collects the following information when you interact with the page(s) where the script is present: page URL, mouse movements and clicks, contact information inputted by the user, a snapshot of the page, including IP address of the user's computer, time on the page, date and time that the TrustedForm Script was loaded, as well as the date and time of the various user interactions with the page, and HTTP headers from the user's browser.

82.    Plaintiffs and Class members were never shown this disclosure or any link to such a disclosure. Prudential's Privacy Policy contains no such provision.

## IV.    Relationship Between Prudential Financial, Inc. and Assurance IQ, LLC

83.    At all relevant times, Assurance IQ acted as the agent of Prudential Financial regarding the webform, term.prudential.com, and Assurance IQ's actions related to the webform were within the scope of that principle-agent relationship. Alternatively, Assurance IQ acted as Prudential's alter ego with respect to its actions related to term.prudential.com.

84.    Prudential Financial acquired Assurance IQ in October 2019 "for $2.2 billion paid at closing, plus the fair value of additional contingent payments of up to $1.2 billion payable in 2023 upon the achievement of certain financial targets."[17]

85.    Following its acquisition, Prudential Financial described the "Assurance IQ division" as one of its "U.S. Businesses," comprising Prudential Financial's principal operations.[18] Prudential

---

[17] Prudential Financial, Inc. 10-K (2019) at 153.

[18] Prudential Financial, Inc. 10-K (2019) at 160 ("The Company's principal operations are comprised of PGIM (the Company's global investment management business), the U.S. Businesses (consisting of the U.S. Workplace Solutions, U.S. Individual Solutions, and Assurance IQ divisions), the International Businesses, the Closed Block division, and the Company's Corporate and Other operations.").

Financial stated in its 2019 10K filing that "We also expect to offer Individual Solutions products on the Assurance IQ platform over time."[19]

86.    Following its acquisition of Assurance IQ, Prudential Financial assigned certain of its executives to roles at Assurance IQ. The Assurance IQ CEO reports to leadership at Prudential, and the companies share certain chief officers, including that Assurance IQ's chief legal offer, chief compliance officer, and chief financial officer are Prudential employees. For example, Assurance IQ's chief legal officer is Doug Morrin, whose title at Prudential is Vice President and Chief Legal Officer, U.S. Distribution.

87.    Prudential Financial decided to expand its direct-to-consumer distribution channels by leveraging Assurance IQ's technology in the way it approached consumer-facing web flows. Prudential Financial uses Assurance IQ's technology on the webform located at term.prudential.com where it offered website visitors a quote for life insurance.

88.    Assurance IQ built and maintains term.prudential.com for Prudential, and Assurance IQ hosts the code for the website.

89.    Prudential Financial directed Assurance IQ's actions in the creation, implementation, and maintenance of the webform.

90.    Before the creation of term.prudential.com, Assurance IQ used ActiveProspect's TrustedForm technology on its own webforms. With full knowledge of how that technology operated, Assurance IQ designed and built Prudential's webform to include ActiveProspect's TrustedForm technology from the time it launched.

91.    Certain chief officers at Prudential Financial including at least Vice President and Chief Legal Officer Doug Morrin also had knowledge of how the TrustedForm technology worked.

92.    Publicly, the webform appeared to be solely a Prudential Financial website during the Class period. The webform has only Prudential's name and logo, and the links in the footer of the page were, during the Class period, only links to other pages at Prudential.com.

---

[19] *Id.* at 55.

93.     From the time term.prudential.com launched in February 2021 to December 13, 2022, no mention of Assurance IQ appeared anywhere on the public face of the webpage other than the fine print on the final page before a user received a life insurance quote, and it contained no link to Assurance IQ's terms of service or privacy policies.

94.     Assurance IQ maintains a database that stores all the information provided by and collected about website visitors who filled out the webform during the Class period. For each visitor who submits information on the webform, the database the includes at least (a) identifying information, including certain metadata (e.g. IP address), (b) the information they inputted in each webform field, (c) a unique TrustedForm certificate number associated with their interaction with the webform, and (d) a link to a TrustedForm certificate created by ActiveProspect.

95.     Prudential Financial and Assurance IQ share data provided by and collected about website visitors to term.prudential.com.

96.     Prudential Financial and Assurance IQ each have the ability to offer quotes and sell life insurance to website visitors who fill out the webform on term.prudential.com. Additionally, if another Prudential distributor sells a website visitor an insurance policy as a result of the visitor's submission of the webform at term.prudential.com, Prudential receives a commission on that sale.

97.     Assurance IQ and Prudential Financial aided and abetted, encouraged, and rendered substantial assistance to ActiveProspect in implementing its technology and to accomplish the wrongful conduct at issue here. In taking action, as alleged herein, to aid, abet, encourage, and substantially assist the commissions of the wrongful acts and other misconduct set forth herein, Assurance IQ and Prudential Financial acted with an awareness of its primary wrongdoing and realized that its conduct would substantially aid the accomplishment of the wrongful acts and purposes set forth herein.

98.     Currently and at all relevant times, the interests of Assurance IQ and Prudential Financial are and were unified. Prudential Financial is the sole governor and sole member of the LCC, and controls Assurance IQ. To the extent Prudential Financial is an entity separate from Assurance IQ, its form should be disregarded to avoid an inequitable result. As the sole governor and sole member of Assurance IQ, Prudential Financial directed the actions taken by Assurance IQ as alleged herein, while also directing Assurance IQ to transfer to Prudential Financial all profits, including but not limited to the

profits stemming from ActiveProspect's wiretap of Class Members' communications on the Prudential.com webform.[20]

## CLASS ACTION ALLEGATIONS

99.     Plaintiffs bring this lawsuit under Federal Rules of Civil Procedure 23(a) and (b)(3) as representatives of a Class of all natural persons who, while in California, visited Prudential.com, provided personal information on Prudential's form to receive a quote for life insurance, and for whom a TrustedForm Certificate URL associated with that website visit was generated.

100.    Excluded from the Class are Defendants, their employees, agents and assigns, and any members of the judiciary to whom this case is assigned, their respective court staff, the members of their immediate families, and Plaintiffs' counsel.

101.    The "Class Period" is from November 23, 2021 to December 13, 2022.[21] Plaintiffs reserve the right to modify, change, or expand the class definition as appropriate based on further investigation and discovery obtained in the case.

102.    **Numerosity**: The Class consists of at least thousands of individuals, making joinder impractical.

103.    **Commonality and predominance**: Common questions of law and fact exist with regard to each of the claims and predominate over questions affecting only individual Class members. Questions common to the Class include:

a.    Whether Defendants violate the California Invasion of Privacy Act ("CIPA"), Cal. Penal Code § 631;

b.    Whether Defendants invaded Plaintiffs' privacy rights in violation of the California Constitution;

---

[20] *See* Prudential Financial, Inc. 10-K (2020); Prudential Financial, Inc. 10-K (2021); Prudential Financial, Inc. 10-K (2022); Prudential Financial, Inc. 10-K (2023) ("Our revenues [related to Assurance IQ] primarily come in the form of . . . [c]ase referral revenues earned from marketing partners related to the transfer of calls, clicks or leads.").

[21] Plaintiffs currently propose that the class period end at the time Prudential changed its website to add a disclosure purporting to secure visitors' consent to use of TrustedForm. Plaintiffs nonetheless do not concede that users after that change provide informed consent before their communications are intercepted.

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:22-cv-07465-CRB

c.   Whether Defendants were unjustly enriched as a result of obtaining users' private and personal information; and

d.   Whether Plaintiffs and Class members are entitled to actual and/or statutory damages for the aforementioned violations.

104.   **Typicality**: The claims of the Plaintiffs are typical of the claims of the Class because the Plaintiffs, like all other Class members, visited Prudential's website and input personal information, which was intercepted and disclosed to ActiveProspect through Prudential's use of TrustedForm.

105.   **Adequacy of representation**: Plaintiffs and their counsel will fairly and adequately protect and advance the interests of Class members. Plaintiffs' interests align with the interests of the Class members they seek to represent. Plaintiffs have retained competent counsel experienced in prosecuting class actions, including consumer privacy cases, and will prosecute this action vigorously.

106.   **Superiority**: The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Class members. The claims of each individual Class member are too small to make individual litigation realistic or feasible. The class action device also presents far fewer management difficulties and provides the benefits of unitary adjudication, economy of scale, and comprehensive supervision by a single court.

## <u>COUNT I</u>

### Violation of the California Invasion of Privacy Act ("CIPA")
### Cal. Penal Code § 631

107.   Plaintiffs repeat the factual allegations contained in the foregoing paragraphs as if fully set forth herein.

108.   Plaintiffs bring this claim individually and on behalf of the members of the Class against Defendants.

109.   To establish liability under section 631(a), a plaintiff need only show that the defendant, does any of the following:

> by means of any machine, instrument, contrivance, or in any other manner, intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system,

*Or*

Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state,

*Or*

Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained,

*Or*

Aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

110.    Section 631(a) is not limited to phone lines but also applies to newer technologies such as computers, the Internet, and email.

111.    ActiveProspect's TrustedForm product is a "machine, instrument, contrivance, or . . . other manner" used to engage in the prohibited conduct at issue in this action.

112.    ActiveProspect's TrustedForm product intercepts Class members' communications in transit while passing over the lines of internet communication by recording them in real time as the user enters information, even before the user clicks a button to submit the completed form to Prudential though its website.

113.    **Prudential's CIPA Violations**: At all relevant times, by using ActiveProspect's TrustedForm technology, Prudential:

    a.    substantially aided, agreed with, employed, and conspired with ActiveProspect to implement ActiveProspect's technology and to accomplish the wrongful conduct at issue here; and

    b.    acted intentionally, as it purposefully contracted with ActiveProspect and programmed the relevant software into its website code.

114.    **ActiveProspect's CIPA Violations**: At all relevant times, by providing TrustedForm's service to Prudential, ActiveProspect:

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:22-cv-07465-CRB

a.    willfully and without the consent of all parties to the communication, read or attempted to read or learn the contents or meaning of electronic communications of Plaintiffs and Class members, while the electronic communications were in transit or passing over any wire, line or cable or were being sent from or received at any place within California.

115.   Plaintiffs and Class members did not consent to any of Defendants' actions connected with ActiveProspect's wiretaps on Prudential's website. Nor did Plaintiffs or Class members consent to Defendants' intentional access, interception, reading, learning, recording, and collection of Plaintiffs' and Class members' electronic communications.

116.   Defendants' violation of section 631(a) constitutes an invasion of privacy.

117.   Plaintiffs and Class members seek all relief available under Cal. Penal Code § 637.2, including statutory damages of $5,000 per violation.

## COUNT II

### Invasion of Privacy
### California Constitution, Art. 1, § 1

118.   Plaintiffs repeat the factual allegations contained in the foregoing paragraphs as if fully set forth herein.

119.   Plaintiffs bring this claim individually and on behalf of the members of the Class against Defendants.

120.   Plaintiffs and Class members have a strong interest in: (1) precluding the dissemination and/or misuse of their sensitive, confidential PII and PHI; and (2) making personal decisions and/or conducting personal activities without observation, intrusion or interference, including the right to visit and interact with various Internet sites without being subjected to wiretaps without Plaintiffs' and Class members' knowledge or consent.

121.   Defendants wrongfully intruded upon Plaintiffs' and Class members' seclusion in violation of California law. Plaintiffs and Class members reasonably expected that the private personal information, including sensitive, confidential PII and PHI, they entrusted to Prudential would be kept private and secure, and would not be disclosed to any unauthorized third party or for any unauthorized purpose.

122.     At all relevant times, by implementing ActiveProspect's wiretaps on Prudential's Website, each Defendant intentionally invaded Plaintiffs' and Class Members' privacy rights protected by the California Constitution, and procured the other Defendant to do the same.

123.     Defendants unlawfully invaded Plaintiffs' and Class members' privacy rights by:

    a.     harvesting their personal information, including sensitive, confidential PII and PHI, and transmitting it to unauthorized third parties or for improper purposes;

    b.     enabling the disclosure of personal and sensitive facts about them in a manner highly offensive to a reasonable person; and

    c.     enabling the disclosure of personal and sensitive facts about them without their informed, voluntary, affirmative, and clear consent.

124.     Plaintiffs and Class members did not consent to any of Defendants' actions in implementing ActiveProspect's wiretaps on Prudential's website.

125.     A reasonable person would find it extremely offensive that Defendants received, collected, and stored private personal information of this nature from Californians without their consent.

126.     In failing to adequately protect Plaintiffs' and Class members' personal information, Defendants acted knowingly and in reckless disregard of their privacy rights. Defendants were aware that using TrustedForm on Prudential.com would share user's private information with an ActiveProspect, an unauthorized third party. Nevertheless, Prudential chose to, and did, use TrustedForm without users' consent and ActiveProspect chose to, and did, offer TrustedForm for use by Prudential without users' consent. Defendants also knew that their conduct would be highly offensive to a reasonable person in Plaintiffs' position given the sensitivity of the information being communicated.

127.     Defendants' unlawful invasions of privacy damaged Plaintiffs and Class members. As a direct and proximate result of these invasions, Plaintiffs and Class members suffered mental distress, and their reasonable expectations of privacy were frustrated and defeated.

128.     Defendants' invasion of privacy is serious in nature, scope, and impact, breaching the social norms underlying the privacy rights that our state Constitution enshrines for all Californians.

129.     As such, Plaintiffs and Class members seek all relief available for invasion of privacy in violation of Article I, Section 1 of California's Constitution.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, respectfully request the Court enter judgment against Defendants through an order:

      a.     Certifying the Class under Rule 23 and appointing Plaintiffs as the representatives of the Class and Plaintiffs' attorneys as Class Counsel;

      b.     Finding in favor of Plaintiffs and the Class on all counts asserted herein;

      c.     Granting Plaintiffs and the Class compensatory, statutory, and/or punitive damages and/or civil penalties or restitution;

      d.     Awarding prejudgment interest on all amounts awarded;

      e.     Awarding Plaintiffs and the Class a reasonable attorney fee and costs of suit; and

      f.     Such other and further relief as the Court deems necessary or appropriate.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rules of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all claims and issues so triable.

Dated: June 6, 2024               Respectfully submitted,

**GIRARD SHARP LLP**

*/s/ Nina R. Gliozzo*
Dena C. Sharp (State Bar No. 245869)
dsharp@girardsharp.com
Simon S. Grille (State Bar No. 294914)
sgrille@girardsharp.com
Nina R. Gliozzo (State Bar No. 333569)
ngliozzo@girardsharp.com
Jordan Isern (State Bar No. 343159)
jisern@girardsharp.com
601 California Street, Suite 1400
San Francisco, CA 94108
Telephone: (415) 981-4800
Facsimile: (415) 981-4846

*Attorneys for Plaintiffs*