KELLY M. KLAUS (State Bar No. 161091)
kelly.klaus@mto.com
JONATHAN H. BLAVIN (State Bar No. 230269)
jonathan.blavin@mto.com
GRACE DAVIS FISHER (State Bar No. 336732)
Grace.DavisFisher@mto.com
MUNGER, TOLLES & OLSON LLP
560 Mission Street, Twenty-Seventh Floor
San Francisco, California 94105-2907
Telephone:     (415) 512-4000
Facsimile:     (415) 512-4077

LAURA D. SMOLOWE (State Bar No. 263012)
laura.smolowe@mto.com
SIDNEY EISNER (State Bar No. 349400)
sidney.eisner@mto.com
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, Fiftieth Floor
Los Angeles, California 90071-3426
Telephone:     (213) 683-9100
Facsimile:     (213) 687-3702

Attorneys for Defendants

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| VALERIE TORRES and RHONDA HYMAN, individually and on behalf of all others similarly situated,<br><br>            Plaintiffs,<br><br>        vs.<br><br>PRUDENTIAL FINANCIAL, INC., ACTIVEPROSPECT, INC., and ASSURANCE IQ, LLC,<br><br>         Defendants. | Case No. 3:22-cv-07465-CRB<br><br>**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**<br><br>[Filed concurrently: Declarations of Kelly M. Klaus and Dr. Nathaniel Polish; [Proposed] Order]<br><br>Date: December 13, 2024<br>Time: 10:00 a.m.<br>Courtroom: Courtroom 6 – 17th Floor<br>Judge: Hon. Charles R. Breyer |

1

# <u>TABLE OF CONTENTS</u>

2

<u>Page</u>

3    I.      INTRODUCTION AND SUMMARY OF ARGUMENT ...................................................1

4    II.      BACKGROUND .........................................................................................................2

5            A.      Prudential's Website and Use of TrustedForm ...........................................2

6            B.      Prudential's Privacy Policy Disclosed Prudential's Sharing of User-
Provided Information with Service Providers ............................................3

7

8            C.      The Named Plaintiffs' Use of the PBP ......................................................4

   III.      ARGUMENT .............................................................................................................5

9            A.      Plaintiffs Have a High Burden to Certify a Rule 23(b)(3) Damages Class...............5

10            B.      Determining Whether a Class Member Impliedly Consented to the
Challenged Data Collection Requires An Individualized Inquiry ...........................6

11

12                 1.      Implied Consent is Determined by the Totality of the Circumstances
and Does Not Depend on Whether Prudential's Privacy Policy
Specifically Said ActiveProspect Would Collect User's Information ..........6

13

14                 2.      Predominance Is Lacking Here Because Individual Class Members
Could Have Learned of the Challenged Data Collection from
15                      Multiple Sources ...........................................................................8

16                       (a)      Prudential's Privacy Policy and Assurance's Privacy Policy
Gave Notice of the Challenged Data Collection ..............................8

17

18                       (b)      Third-Party Reports and Plaintiffs' Counsel's Own
Advertisements Disclosed the Challenged Data Collection..............9

19                 3.      Empirical Evidence Shows that Significant Numbers of Class
Members Likely Were Aware of the Challenged Practices ........................10

20

21            C.      Determining Whether Putative Class Members Have Standing to Assert a
CIPA Claim Requires an Individualized Inquiry .....................................11

22                 1.      The Database Entries Will Not Establish that the Individuals Named
Were the People Who Used the PBP .........................................12

23

24                 2.      Determining Whether a Potential Class Member Was In California
When They Visited the Website Will Require an Individualized
Inquiry ...........................................................................13

25

26    IV.      CONCLUSION ...........................................................................................14

27

28

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**FEDERAL CASES**

4

*Am. Ex. Co. v. Italian Colors Rest.*,
   570 U.S. 228 (2013) .................................................................................................5

5

6

*Backhaut v. Apple Inc.*, No. 14-CV-02285-LHK, 2015 WL 4776427 (N.D. Cal.
   Aug. 13, 2015),
   *aff'd*, 723 F. App'x 405 (9th Cir. 2018) ..............................................................6, 7, 8

7

8

*Black Lives Matter Los Angeles v. City of Los Angeles*,
   113 F.4th 1249, 2024 WL 4048895 (9th Cir. Sept. 5, 2024) .....................................5

9

*Brown v Google LLC*,
   No. 20-CV-03664-YGR, 2022 WL 17961497 (N.D. Cal. Dec. 12, 2022) ....................... passim

10

11

*Campbell v. Facebook Inc.*,
   315 F.R.D. 250 (N.D. Cal. 2016) ................................................................................9

12

*Federated Univ. Police Officers' Ass'n v. Regents of Univ. of Cal.*,
   SACV 15-137-JLS (RNBx), 2016 WL 9107427 (C.D. Cal. Aug. 18, 2016)...............6

13

14

*In re Google Inc. Gmail Litig.*,
   No. 13-MD-02430-LHK, 2013 WL 5423918 (N.D. Cal. Sept. 26, 2013) .................12

15

16

*In re Google RTB Consumer Privacy Litig.*,
   No. 4:21-CV-02155-YGR, 2024 WL 2242690 (N.D. Cal. Apr. 4, 2024) ...............7, 10

17

*Hart v. TWC Prod. & Tech. LLC*,
   No. 20-CV-03842-JST, 2023 WL 3568078 (N.D. Cal. Mar. 30, 2023) .....................7

18

*In re Google Inc. Gmail Litig.*,
   No. 13-MD-02430-LHK, 2014 WL 1102660 (N.D. Cal. Mar. 18, 2014) .............1, 6, 7

19

20

*Johansen v. Efinancial LLC*,
   2021 WL 7161969 (W.D. Wash. June 11, 2021), *report and recommendation
   adopted*, 2022 WL 168170 (W.D. Wash. Jan. 18, 2022) .........................................13

21

22

*Moore v. Apple Inc.*,
   309 F.R.D. 532 (N.D. Cal. 2015) ..............................................................................11

23

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
   31 F.4th 651 (9th Cir. 2022).....................................................................................11

24

25

*Reyes v. Educ. Credit Mgmt. Corp.*,
   773 F. App'x 989 (9th Cir. 2019)...............................................................................6

26

*Smith v. Facebook, Inc.*,
   745 F. App'x 8 (9th Cir. 2018).................................................................................6

27

28

*Stiner v. Brookdale Senior Living, Inc.*, 665 F. Supp. 3d 1150 (N.D. Cal. 2023),
   *opinion clarified*, 2024 WL 3498492 (N.D. Cal. July 22, 2024) ............................12

*Torres v. Nutrisystem, Inc.*,
  289 F.R.D. 587 (C.D. Cal. 2013) ..............................................................................7

*TransUnion LLC v. Ramirez*,
  594 U.S. 413 (2021) ..............................................................................................11

*United States v. Vosburgh*,
  602 F.3d 512 (3d Cir. 2010) ..................................................................................13

**STATE CASES**

*Massachusetts v. Molina*,
  476 Mass. 388, 71 N.E.3d 117 (Mass. App. Ct. 2017) ...........................................13

**FEDERAL STATUTES**

47 U.S.C. § 227 ...............................................................................................................1, 3

**STATE STATUTES**

Cal. Penal Code § 631 ............................................................................................... passim

Cal. Penal Code § 637.2 ....................................................................................................12

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

1    I.       __INTRODUCTION AND SUMMARY OF ARGUMENT__

2         Plaintiffs claim Prudential allowed its software vendor, ActiveProspect, the maker of

3    TrustedForm, to "watch[] over [Plaintiffs'] shoulder" and steal their information.  Mot. at 1:9-10.

4    That is baseless.  TrustedForm is not a spy tool:  its sole use was to help Prudential document

5    compliance with the Telephone Consumer Protection Act, 47 U.S.C. § 227 ("TCPA"), and thereby

6    deter or counter bogus TCPA claims.  The information TrustedForm collected was maintained in

7    "cold" storage, and only Prudential (and its wholly owned subsidiary, Assurance), could access it.

8    ActiveProspect could not use the data users submitted for any purpose.  Using a vendor for data

9    collection is not just industry standard but also known about and *expected* by more than 30% of

10   the proposed class.

11        Plaintiffs nevertheless seek to certify a class of individuals who, while in California, used

12   the Prudential website to request a life insurance quote.  Plaintiffs' Motion to Certify a Rule

13   23(b)(3) damages class ("Motion") should be denied because Plaintiffs fail to carry their burden of

14   proving that common questions will predominate over individual issues.  In particular, the

15   following issues, which are central to Plaintiffs' claim, will have to be decided on an individual

16   basis:

17        ***Absence of consent.***  Each class member will have to show they did not consent to the

18   challenged data collection.  Consent may be implied, and whether each class member provided it

19   is a highly fact-intensive inquiry "based on *all* of the surrounding circumstances."  *In re Google*

20   *Inc. Gmail Litig.,* No. 13-MD-02430-LHK, 2014 WL 1102660, at *19 (N.D. Cal. Mar. 18, 2014).

21   The relevant circumstances here include:

22   •         what each class member knew based on Prudential's Privacy Policy;

23   •         each class member's prior experience with the substantially similar Assurance

24            webforms, which were the basis for the Prudential form and which both named

25            Plaintiffs repeatedly visited (and whose website terms they accepted) before

26            visiting the Prudential site; and

27   •         publicly available sources discussing the use of vendor software to collect user

28            data.

1    Empirical survey data confirms there was significant knowledge about the challenged

2  practice among the putative class:  more than three in ten California consumers who shopped for

3  insurance online believe their provided data is shared through software provided by third-party

4  vendors.

5    **Standing.**  Each class member will have to show (1) they themselves used the Prudential

6  webform, i.e., that it was their "communications" that were allegedly "intercepted," rather than

7  those of someone else entering information on their behalf; and (2) they used the webform while

8  in California.  Contrary to Plaintiffs' claim, the Assurance database of webform responses will not

9  automatically answer these questions for all class members.  Indeed, one of the named Plaintiffs

10  here input a family member's information during a visit to a very similar Assurance webform.

11  **II.    BACKGROUND**

12    **A.    Prudential's Website and Use of TrustedForm**

13    Prudential is a global financial services provider.  ECF No. 56 ¶ 15.  In 2019, Prudential

14  acquired Assurance, a technology-focused insurance startup, to serve the growing market for

15  consumers shopping for insurance online.  *Id.* ¶¶ 84, 87; Ex. 1[1] (Renz Dep. 24:6-10; 25:15-22).

16  Prudential and Assurance personnel then built the "Pru Branded Path" ("PBP"), a platform that

17  allowed consumers to receive personalized life insurance quotes based on their "Webform"

18  answers to questions relevant to obtaining life insurance.  Ex. 1 (Renz Dep. 26:1-6).  Assurance

19  already had deployed a customized life insurance webform on its sites; the PBP leveraged the

20  Assurance technology and website infrastructure.  Ex. 1 (Renz Dep. 33:6-14).

21    Prudential.com visitors reached the PBP by clicking "Get an instant quote," which brought

22  up the Webform.  ECF No. 56 ¶ 44.  The Webform's last page explained that, by clicking "View

23  My Results," the user "agree[d]" that Prudential and its "affiliates . . . including Assurance IQ . . .

24  can contact me for marketing purposes by phone call."  Exs. 10, 12.  The request for a call

25

26

27  ---
[1] Except as otherwise noted, all "Ex." references are to Exhibits attached to the accompanying

28  Declaration of Kelly M. Klaus ("Klaus Decl.").

1   triggered the TCPA, which requires prior written consent to receive marketing calls.  47 U.S.C.

2   § 227(b)(1).

3          To document users' TCPA consent, Prudential and Assurance integrated TrustedForm into

4   the PBP, just as that software had been integrated into Assurance's pre-existing webforms.  Ex. 1

5   (Renz Dep. 30:1-31:10).  TrustedForm is ActiveProspect's "lead certification product" for

6   documenting TCPA consent.  Ex. 17 at 3.  Tools like TrustedForm are industry-standard

7   components of legal compliance.  Ex. 2 (Rafferty Dep. 86:13-14; errata p. 1 ("[O]ur script is on

8   about [50,000] websites. It's a standard in the industry."); *see* Ex. 3 (Hyman Dep. 58:14-17)

9   (agreeing it is a "good idea" for companies like Prudential to have a record of contacting only

10  users who agree to be contacted); Ex. 4 (Torres Dep. 46:5-47:12) (same).[2]

11         If the user completes the Webform and consents to be contacted, TrustedForm generates a

12  certificate and a unique Certificate ID.  One must have the Certificate ID to view the record of the

13  user's visit.  Ex. 18.  The Certificate ID is sent to ActiveProspect's customer, here,

14  Prudential/Assurance; the underlying data is encrypted and subsequently stored on

15  ActiveProspect's servers in cold storage.  *Id.*  "[E]ach certificate is like a lock box, and that

16  certificate ID is the key to that lock box."  Ex. 2 (Rafferty Dep. 106:6-10).

17         **B.     Prudential's Privacy Policy Disclosed Prudential's Sharing of User-Provided
               Information with Service Providers**

18

19         During the proposed class period, Prudential's Privacy Policy was linked on

20  Prudential.com and clearly accessible to any user *before* navigating to the PBP.  Ex. 1 (Renz Dep.

    251:9-19).  The Privacy Policy also was linked on each page of the Webform.  *Id.*; Ex. 10 at 6.

21         The Privacy Policy told users that Prudential "collect[s] [users'] personal information . . .

22  such as when [users] fill out applications and other forms" and "when [users] visit or enter

23

24

---

25  [2] Plaintiffs claim that ActiveProspect admitted "that it . . . deliberately designed [TrustedForm] *to
    intercept communications* on other companies' websites *in real time*."  Mot. at 9:9-11 (emphasis

26  added).  In fact, ActiveProspect's CEO testified that TrustedForm "documents the events that take
    place on a page where it's installed and *batches those, [and] ends up send[ing] them* to our server,

27  which [events] are then collected" and "*locked and stored for that site owner for their use*."  Ex. 2

28  (Rafferty Dep. at 110:7-12 (emphasis added)).

personal details on our websites." Ex. 8.[3]  The Policy further explained that Prudential "may share [users'] personal information . . . *with other non-Prudential companies who perform services for us or on our behalf*, for our everyday business purposes." *Id.* (emphasis added).

The evidence is undisputed that ActiveProspect does not use or share *any* user-submitted data collected from the PBP.  The only thing ActiveProspect does with that data is store it on Prudential/Assurance's behalf.  Ex. 2 (Rafferty Dep. 106:8-22; 123:22-124:2).  ActiveProspect *does not and cannot* use any user's personal information for any independent purpose.  Ex. 17 at 1 ("[W]e do not store user data or PII in a way that can be extracted or accessed, outside of the session replay contained in the [TrustedForm] certificate"); Ex. 2 (Rafferty Dep. 148:5-7 ("[W]e don't use any user submitted data here, because we don't have the capability to see anything that's user submitted.")).

**C.**     **The Named Plaintiffs' Use of the PBP**

Plaintiffs copied much of their complaint from the complaint in *Javier v. Assurance IQ*, No. 3:20-cv-02860-CRB (N.D. Cal. filed Apr. 24, 2020).  Javier alleged he visited an Assurance-operated website to obtain a life insurance quote.  He claimed that Assurance's use of TrustedForm violated the California Invasion of Privacy Act ("CIPA"), Cal. Penal Code § 631.  In June 2023, this Court dismissed Javier's complaint as time-barred.  *Javier* ECF No. 95.

The four plaintiffs originally named in this case all alleged they used the PBP between March and November 2022.  ECF No. 1.  Discovery revealed that two of the plaintiffs (Tyrone Hazel and Roxane Evans) did not visit the PBP at all.  In a court filing, plaintiffs said their allegation about using the PBP was a "reasonabl[e] mistak[e] because they had actually filled out nearly identical forms on Defendants' other websites," ECF No. 52 at 3, i.e., the Assurance websites upon which the PBP was modeled.

---

[3] The Policy explained that the personal information Prudential collected and could share with others included "[n]ame," "address, email address, telephone number, and other contact information," "medical information for insurance applications," "video and audio recordings, and biometric data," and "information gathered from [users'] internet or network activity."  Ex. 8.

1   The remaining plaintiffs (Rhonda Hyman and Valerie Torres) did fill out the PBP

2   Webform.  Both had previously filled out similar webforms on Assurance sites, which were at

3   issue in *Javier*.  Exs. 14-15.  Hyman, a registered life insurance broker, completed the PBP

4   Webform and agreed to Prudential's Privacy Policy in December 2021.  Ex. 3 (Hyman Dep.

5   11:23; 123:13-124:5); Ex. 13 at 2; Ex. 15.  Before then, Hyman had visited an Assurance website

6   (nationalfamily.com).  Ex. 15.  The Assurance webforms Hyman completed were substantially

7   similar to the PBP.  ECF No. 52 at 9; *see* Exs. 13, 16.  During some of her visits, Hyman did not

8   provide her own information:  in one case she provided *her father's* information; in another, she

9   used a made-up alias for a name.  Ex. 3 (Hyman Dep. 17:21-18:5; 105:2-14).

10   Similarly, before Torres completed the PBP Webform in October 2022, Ex. 4 (Torres Dep.

11   11:7-16), Exs.14, 9, she visited Assurance-powered sites *eight times*.  *Id*.  During each of those

12   visits, Torres filled out a nearly identical webform, consented to be contacted, and assented to

13   Assurance's Privacy Policy.  *Id*.

14   **III.   <u>ARGUMENT</u>**

15   **A.    <u>Plaintiffs Have a High Burden to Certify a Rule 23(b)(3) Damages Class</u>**

16   "Class actions are the 'exception to the usual rule that litigation is conducted by and on

17   behalf of the individual named parties only.'"  *Black Lives Matter Los Angeles v. City of Los*

18   *Angeles*, 113 F.4th 1249, 2024 WL 4048895, at *5 (9th Cir. Sept. 5, 2024) (quoting *Comcast*

19   *Corp. v. Behrend*, 569 U.S. 27, 33 (2013)).  "Class certification is thus not to be granted lightly."

20   *Id*.  "To ensure that it is not, Rule 23 mandates that district courts 'rigorous[ly] analy[ze]' whether

21   a proposed class meets various requirements."  *Id*.  "[I]n practice," the "stringent requirements" of

22   Rule 23 "exclude most claims."  *Am. Ex. Co. v. Italian Colors Rest.*, 570 U.S. 228, 234 (2013).

23   "[T]o certify a damages class under Rule 23(b)(3), the burden [on Plaintiffs] is even

24   higher" than it is to show commonality of issues:  "the district court must find that common

25   questions predominate over individual ones."  *Black Lives Matter L.A.*, 2024 WL 4048895, at *5.

26   "Showing predominance is difficult, and it regularly presents the greatest obstacle to class

27   certification."  *Id*. (quotation omitted).  Plaintiffs fail to make that showing here.

28

**B.**     **Determining Whether a Class Member Impliedly Consented to the Challenged Data Collection Requires An Individualized Inquiry**

Each plaintiff bears the burden of proving lack of consent on their CIPA § 631(a) claim. *See Reyes v. Educ. Credit Mgmt. Corp.*, 773 F. App'x 989, 990 n.1 (9th Cir. 2019) ("[U]nder California law, the plaintiff bringing a CIPA claim has the burden to prove that the defendant lacked consent to record."); *see Federated Univ. Police Officers' Ass'n v. Regents of Univ. of Cal.*, SACV 15-137-JLS (RNBx), 2016 WL 9107427, at *7 (C.D. Cal. Aug. 18, 2016).

"Consent may be express or implied."  *Backhaut v. Apple Inc.*, No. 14-CV-02285-LHK, 2015 WL 4776427, at *14 (N.D. Cal. Aug. 13, 2015), *aff'd*, 723 F. App'x 405 (9th Cir. 2018). "Implied consent is an intensely factual question that requires consideration of the circumstances surrounding the interception to divine whether the party whose communication was intercepted was on notice that the communication would be intercepted."  *In re Google Inc. Gmail Litig.*, 2014 WL 1102660, at *16; *Smith v. Facebook, Inc.*, 745 F. App'x 8 (9th Cir. 2018) (courts consider "whether *the circumstances, considered as a whole*, demonstrate that a reasonable person understood that an action would be carried out so that their acquiescence demonstrates knowing authorization." (emphasis added)).

**1.**     **Implied Consent is Determined by the Totality of the Circumstances and Does Not Depend on Whether Prudential's Privacy Policy Specifically Said ActiveProspect Would Collect User's Information**

Plaintiffs argue there are no individualized consent issues because Prudential's Privacy Policy "did not inform visitors that ActiveProspect would intercept their communications in real time." Mot. at 11:8-9.  That argument does not show consent may be determined class-wide for two reasons.  First, there is no requirement that a website owner must name specific vendors or describe the specific data collection in minute detail.  "[A] fact-finder could find implied consent even based on broad disclosures."  *In re Google, Inc. Gmail Litig.*, 2014 WL 1102660, at *20. Second, implied consent is not determined solely by reference to the website's privacy policy. The fact-finder must consider "*all of the circumstances* surrounding the interceptions to determine whether an individual knew that her communications were being "intercepted."  *Id.* (emphasis

1  added); *Backhaut*, 2015 WL 4776427 at *15 (the "panoply of sources from which a proposed

2  individual class member . . . could have been put on notice" is relevant).

3          Two recent decisions in this District demonstrate how a wide variety of sources may show

4  implied consent.  *Brown v Google LLC*, No. 20-CV-03664-YGR, 2022 WL 17961497, at *1 (N.D.

5  Cal. Dec. 12, 2022), involved a challenge to Google's alleged collection of data while users were

6  in "private browsing mode."  The court held that a class could not be certified where issues of

7  consent turned on "individual, and subjective, interactions of what certain class members knew,

8  read, saw, or encountered" about private browsing mode.  *Id.* at *19.  That conclusion was based

9  not only on what Google said in its privacy policy, but on media and academic reports about

10 private browsing mode and expert survey evidence.

11         *In re Google RTB Consumer Privacy Litigation*, No. 4:21-CV-02155-YGR, 2024 WL

12 2242690 (N.D. Cal. Apr. 4, 2024), involved alleged sharing and selling of users' personal

13 information obtained through Google's "Real-Time Bidding" system.  The court denied class

14 certification, holding there were individualized issues of consent that could be based on "each

15 account holder's individual, and subjective, understanding of Google's, RTB participants', and

16 third parties' disclosures."  *Id.* at *14.  In this case, too, expert survey evidence buttressed the

17 court's conclusion that there were important individual differences among class members.

18         Numerous other cases have denied certification where facts and circumstances besides the

19 website's privacy policy could show implied consent.[4]

20

21

22

23 _____

[4] *See Hart v. TWC Prod. & Tech. LLC*, No. 20-CV-03842-JST, 2023 WL 3568078, at *11 (N.D.
24 Cal. Mar. 30, 2023) (finding predominance lacking where class members could have learned of
   challenged conduct by reading defendant's privacy policy or published news articles); *In re*
25 *Google Inc. Gmail Litig.*, 2014 WL 1102660, at *16 (lack of predominance for CIPA and other
   claims based on Google's and third-parties' disclosures and news articles); *Backhaut*, 2015 WL
26 4776427, at *14 (predominance lacking where class members could have learned about challenged
   practices through news articles, online postings, website disclosures, and message boards); *Torres*
27 *v. Nutrisystem, Inc.*, 289 F.R.D. 587, 595 (C.D. Cal. 2013) (predominance lacking where class
   members' prior interactions with defendant may have put them on notice of challenged practice).
28

1

2

          **2.**      **Predominance Is Lacking Here Because Individual Class Members Could Have Learned of the Challenged Data Collection from Multiple Sources**

3

      Here, the "panoply of sources," *Backhaut*, 2015 WL 4776427, at *15, that could have

4

informed class members about the challenged data collection before they entered data include

5

Prudential's Privacy Policy and other disclosures class members saw, press reports about this and

6

similar cases involving "session replay" software, and counsel's advertisements to recruit class

7

members.  These sources will need to be considered and analyzed with respect to each of many

8

thousands of individual class members, undermining Plaintiffs' claim of predominance.

9

          *(a)*      *Prudential's Privacy Policy and Assurance's Privacy Policy Gave Notice of the Challenged Data Collection*

10

11

      Prudential's Privacy Policy expressly stated that Prudential "collect[ed]" users' "personal

12

information" when they "enter[ed] personal details on our websites," *and* that Prudential could

13

"share your personal information . . . with *other non-Prudential companies who perform services*

14

*for us* or on our behalf[.]"  Ex. 8 (emphasis added).  Prudential is entitled to raise implied consent

15

as to each individual class member who (1) knew about the Policy and (2) then filled out the

16

Webform.  This will necessitate an individual, not a class-wide, inquiry.

17

      It is likely that a significant number of class members knew about the sharing of Webform

18

data with vendors because those members had previously used substantially similar webforms,

19

namely, Assurance's, before using the PBP.  Both of the remaining named Plaintiffs completed

20

webforms on Assurance sites on multiple occasions before using the PBP; those plaintiffs

21

necessarily assented to Assurance's privacy policy.  *Javier* ECF No. 95 at 4-5; Exs. 14 at 1, 15 at

22

56.  And that policy, as this Court held in *Javier*, put consumers on notice that their webform

23

communications could be monitored by a third-party vendor.[5]  *Javier* ECF No. 95 at 5.  That

24

knowledge would be relevant when the same class members used the PBP.

25

      Plaintiffs cannot avoid this result by claiming the Assurance site was different than the

26

PBP.  The PBP was based on and is substantially similar to the Assurance webform.  Indeed, the

27

28

---

[5] Both of the remaining named Plaintiffs testified that they shopped for life insurance across multiple websites.  Ex. 3 (Hyman Dep. 86:8-; 87:4); Ex. 4 (Torres Dep. 131:2-132:2); Exs. 5-6.

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

two named plaintiffs who exited the case said they were mistaken about which site they visited because the Prudential and Assurance webforms were "nearly identical." *See* ECF 52 at 2. Plaintiffs also assert that Prudential's Privacy Policy gave no "indication that Assurance played any role in the operation of the [PBP]," Mot. at 11:12-13, but that is simply wrong. *See* Ex. 8 (stating, in first paragraph, that Prudential's Policy "is provided on behalf of the" listed companies, including Assurance); Ex. 13 at PRU0002589, PRU0002590 (identifying Assurance as a Prudential company that may call users).

> (b)  *Third-Party Reports and Plaintiffs' Counsel's Own Advertisements Disclosed the Challenged Data Collection*

In determining implied consent, the fact-finder may also consider whether individual class members were aware of press coverage of this and related lawsuits. *See Campbell v. Facebook Inc.*, 315 F.R.D. 250, 266 (N.D. Cal. 2016) ("individual issues of implied consent do predominate . . . due to the media reports on the practice" because "as long as users heard about it from somewhere and continued to use the relevant features, that can be enough to establish implied consent"); *Brown*, 2022 WL 17961497, at *19 (in deciding issue of implied consent, fact-finder "would have to determine the sources of information to which each class member was exposed," including news articles and media reports). For example, a November 2022 article entitled "Prudential Accused of Illegally Snooping on Online Shoppers in Suit" discussed Prudential's use of ActiveProspect. Ex. 11. Additional articles discuss the prevalence of session replay software on consumer-facing websites. *See, e.g.,* Ex. 20. Likewise, there was significant media coverage of the *Javier* case and the use of TrustedForm on quote-request sites. *See, e.g.,* Ex. 21. Whether individual class members reviewed these reports before using the PBP is relevant to implied consent.

Moreover, during at least part of the class period, Plaintiffs' counsel ran advertisements on social media stating anyone who had visited the Prudential website may have had their personal information exposed and could be entitled to compensation. Ex. 19; Ex. 3 (Hyman Dep. 20:21-21:6; 21:17-22); Ex. 4 (Torres Dep. 26:3-10). Counsel started running those ads on October 4,

1    2022, more than two months before the end of the class period, December 13, 2022.  Klaus Decl.

2    ¶¶ 23-25; Ex. 22.

3          Assurance records indicate that, within this time period, there were more than 6,000 visits

4    to the PBP from IP addresses that indicate a California location.[6]  Klaus Decl. ¶ 26.  If any class

5    member was one of the people who read counsel's advertisement before using the PBP, the class

6    member would have at least been put on inquiry notice of the alleged conduct here and may have

7    impliedly consented to it.  Whether that is the case may be determined only on an individual basis

8    through discovery and adjudication.

9          The foregoing are examples of articles and other materials that individual class members

10   may have reviewed that describe Prudential's data collection practices and could support an

11   implied consent defense.  Discovery from individual class members may reveal other sources of

12   information.  That said, these examples, in conjunction with the other issues discussed above,

13   show that the question of implied consent must be resolved separately for each individual in the

14   proposed class.

15                3.    **Empirical Evidence Shows that Significant Numbers of Class Members Likely Were Aware of the Challenged Practices**

16

17         Courts have relied on consumer surveys "detailing how class members had divergent

18   knowledge and expectations" in denying Rule 23(b)(3) certification based on plaintiffs' failure to

19   satisfy the rule's predominance requirement.  *See, e.g., Brown*, 2022 WL 17961497, at *18; *In re*

20   *Google RTB Consumer Priv. Litig.*, 2024 WL 2242690, at *14.

21         A survey conducted by Defendants' expert, Dr. Nancy Mathiowetz, found that a significant

22   portion of potential class members were aware of and expected third-party data collection on

23   online insurance sites.  Ex. 7 ¶ 12.  Dr. Mathiowetz surveyed individuals who, while living in

24   _____

25   [6] As discussed *infra*, at pages 13-14, an IP address that shows a California location does not
     necessarily mean the user was in California at the time they accessed the PBP.  Plaintiffs contend
     that the list of IP addresses suffices to prove a California location on a class-wide basis.

26   Regardless of how that issue is resolved, the fact remains that a significant number of individuals
     within the proposed class visited the PBP after counsel started running their advertisements, and

27   some number of those individuals may have visited the PBP for the first time with the knowledge
     provided by counsel's advertisements.

28

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

1    California, had shopped for a life insurance quote online since January 2022.  *Id.* ¶¶ 28-30.  She

2    found that the large majority of respondents (approximately 71%) were aware of third-party

3    software on websites before taking the survey.  *Id.* ¶ 50.

4        Plaintiffs assert, without supporting evidence, that "[a]n ordinary consumer would not

5    know that their answers in the life insurance form are being recorded or shared with a third party."

6    SAC ¶ 48.  Dr. Mathiowetz's survey findings refute this assertion.  She found that nearly 36% of

7    respondents *expected* that a website owner would use a third-party software provider to collect and

8    store responses to an insurance-request webform.  Ex. 7 ¶ 54.  Dr. Mathiowetz also found that

9    nearly 31% of respondents believed their data was sent to the software provider almost as soon as

10   they entered the data in the webform.  *Id.* ¶ 56.

11       As in *Brown* (and other cases discussed above), these survey results show "divergent

12   knowledge and expectations regarding [class members'] privacy."  2022 WL 17961497, at *18-19.

13   Dr. Mathiowetz's survey, along with "all of the circumstances" surrounding the use of

14   TrustedForm on the PBP, show that many class members knew about the alleged interception and

15   nevertheless used the PBP.  A fact-finder could conclude that such class members failed to satisfy

16   their burden to show the absence of consent.  That determination cannot be made on a class-wide

17   basis, but must be determined individually.  Common issues do not predominate.

18   **C.**    **Determining Whether Putative Class Members Have Standing to Assert a**
         **CIPA Claim Requires an Individualized Inquiry**

19

20       Plaintiffs need not prove that each class member has standing at the class certification

21   stage, but "[e]very class member must have Article III standing in order to recover individual

22   damages."  *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021).  The Ninth Circuit has held

23   that Rule 23 "requires a district court to determine whether individualized inquiries into" standing

24   "predominate over common questions."  *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee*

25   *Foods LLC*, 31 F.4th 651, 668 n.12 (9th Cir. 2022); *Moore v. Apple Inc.*, 309 F.R.D. 532, 542

26   (N.D. Cal. 2015) ("whether or not the proposed class includes class members who have not

27   suffered an injury is a Rule 23 question").

28

1    In this case, there are significant questions regarding whether particular class members will

2    be able to show they suffered injury under CIPA.  *See Stiner v. Brookdale Senior Living, Inc.*, 665

3    F. Supp. 3d 1150, 1182 (N.D. Cal. 2023) ("the Court will consider the extent to which it will

4    eventually have to engage in individualized inquiries to determine whether each of the putative

5    class members has standing as part of the Rule 23 inquiry"), *opinion clarified*, 2024 WL 3498492

6    (N.D. Cal. July 22, 2024).

7    Plaintiffs argue they may use a database (maintained by Assurance) of visits to the PBP as

8    the means of identifying those class members who visited the PBP while in California.  Mot. at 2,

9    5, 14.  But as explained below, the database does not settle (1) whether the person named in the

10   database is the person who used the PBP, and (2) whether the person was in California when they

11   accessed the PBP.  These are individualized issues.

### 1.   The Database Entries Will Not Establish that the Individuals Named Were the People Who Used the PBP

12

13   To have a claim under CIPA § 631(a), a class member must, inter alia, have had their

14   communication intercepted.  Cal. Penal Code § 637.2; *In re Google Inc. Gmail Litig.,* No. 13-MD-

15   02430-LHK, 2013 WL 5423918, at *17 (N.D. Cal. Sept. 26, 2013).  To determine whether a

16   particular entry in the Assurance database corresponds to an individual with a potential CIPA

17   claim, the fact-finder must find that individual entered their own information.  Only the person

18   who entered the information (whether it be their own or someone else's) can allege that their

19   "communication" with the Prudential webform was purportedly "intercepted."

20   Based on the experience of the named Plaintiffs, this issue affects a significant number of

21   putative class members.  One of the two plaintiffs, Hyman, admitted she entered four different

22   names, including in one case the name and personal information of her father, into four different

23   Assurance webforms.  Ex. 15 at 1.  While Hyman entered her own name into the PBP, her prior

24   actions confirm that people can and do request life insurance quotes not only for themselves but

25   for family members or others.

26   If one of the two named Plaintiffs entered someone else's name and information into

27   nearly identical life insurance webforms, it is likely that other names and information in the

28

database for the PBP do not correspond to individuals with a potential claim.  This issue may only be sorted out with discovery and a determination as to each individual class member.

**2.      Determining Whether a Potential Class Member Was In California When They Visited the Website Will Require an Individualized Inquiry**

Plaintiffs say they will satisfy § 631(a)'s requirement of showing class members' communications were "sent from, or received at any place within" California by using the Assurance database, "which include[s] the IP address of website visitors who submitted the webform."  Mot. at 9.  Plaintiffs say this proof will suffice "because IP address indicates [a user's] geolocation at the time they communicated with Prudential through its website."  *Id.*

On the contrary, IP addresses do not necessarily indicate an individual's location when accessing a particular website.  This is so for a number of reasons, including the widespread use of virtual private networks ("VPNs") and proxy servers.  Declaration of Dr. Nathaniel Polish ("Polish Decl.) ¶¶ 9, 11-17; *see Johansen v. Efinancial LLC*, 2021 WL 7161969, at *8 (W.D. Wash. June 11, 2021) (IP address "*provides no meaningful information about who submitted the online form for a life insurance quote*"; "IP addresses can be unreliable indicators of physical location" (emphasis added)), *report and recommendation adopted*, 2022 WL 168170 (W.D. Wash. Jan. 18, 2022); *Massachusetts v. Molina*, 476 Mass. 388, 394-95, 71 N.E.3d 117, 126 (Mass. App. Ct. 2017) (IP address alone is too unreliable to support probable cause); *United States v. Vosburgh*, 602 F.3d 512, 527 n.14 (3d Cir. 2010) (recognizing that "proxy servers can be used to mask IP addresses"); *Brown*, 2022 WL 17961497, at *14 (refusing to exclude Defendant's expert's methodology finding that IP addresses cannot reliably identify class members).

The record here shows there will be significant individual questions involving potential class members' VPN use and location at the time of accessing the PBP.  Dr. Mathiowetz's survey showed that approximately 18% of people who shopped for insurance online since 2022 always or usually use a VPN; approximately 58% used a VPN at least once in the last year.  Ex. 7 ¶ 45, Table 1.  Thus, there is reason to believe that a significant number of class members may have accessed the PBP while using a VPN.  Given the level of sophistication with user-privacy

-13-

1   technology, a significant number of class members also may have accessed the PBP using a proxy

2   server.

3          For these reasons, whether class members actually were in California at the time they

4   accessed the PBP cannot be resolved solely by looking at IP addresses in the Assurance database.

5   Whether an individual class member was using a VPN or proxy server, and if so, whether they

6   were in California at the time, will have to be resolved on an individual basis.

7   **IV.    CONCLUSION**

8          For the foregoing reasons, Plaintiffs fail to show that common issues predominate over

9   individualized issues.  Defendants respectfully request that the Court deny Plaintiffs' Motion.

10  DATED:  September 25, 2024                MUNGER, TOLLES & OLSON LLP

11

12

13                                      By:    _/s/ Kelly M. Klaus_
                                               KELLY M. KLAUS
14                                             Attorneys for Defendants

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

1

## CERTIFICATE OF SERVICE

2          I hereby certify that on September 25, 2024, I electronically filed the foregoing

3    Defendants' Opposition to Plaintiffs' Motion for Class Certification with the Clerk of the Court

4    using the CM/ECF system, which will automatically send notification of the filing to all counsel

5    of record.  I also caused a copy of all documents that are the subject of Defendants'

6    contemporaneously filed Administrative Motion to Seal to be served via electronic mail on

7    Plaintiffs' counsel.

8

9

10

11                                                  By:      */s/ Kelly M. Klaus*

12                                                           KELLY M. KLAUS

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28